## Case No. 2,903.

### The CLOTILDA.

[1 Hask. 412.] [1]

District Court, D. Maine. June, 1872.

VALIDITY OF BOTTOMRY BOND—REQUISITES—SALVAGE AGREEMENT—PRESUMPTION OF FAIRNESS—BURDEN OF PROOF—CONTRIBUTION—COMPENSATION.

1. An obligation is not strictly a bottomry bond and cannot be enforced as such, which the master of a vessel cast upon the shore gave for a loan to relieve his vessel and her cargo from distress, wherein he binds himself absolutely as well as his vessel and her cargo to repay the loan in a specified time, no voyage being set out upon which if the vessel and cargo should be lost by the perils of the sea, &c., the obligation is to become void.

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

2. The master, in case of necessity, is justified in procuring such loan to relieve his vessel and cargo from the liens of salvors and prevent delay and expense in their enforcement, and for this purpose he can bind the vessel and cargo.

3. A salvage agreement between the master and salvors is presumed to be fair and equitable, and the burden rests upon the claimants to prove it contrary to equity and justice, or that it was procured by fraud and compulsion.

4. Such agreement to pay a specific price, proved to have been entered into under a mistake by both parties as to the value of the property to be saved, and manifestly inequitable, should be disregarded by the admiralty court in awarding salvage.

5. A vessel cast upon the shore and in imminent peril should bear an equitable proportion of the salvage awarded for landing the cargo, when the vessel is thereby lightened and enabled to pass to a place of greater safety.

6. Salvage for landing the cargo under such circumstances should be assessed ratably upon the value of the cargo and the value of the vessel after deducting the salvage chargeable to it.

7. A salvage of six thousand dollars is allowed for landing a cargo from a steamer cast upon Wells beach in December, and is assessed upon the property saved valued at $20,000.

In admiralty. Libels for salvage and to enforce a lien upon the vessel and cargo for money loaned the master to relieve his vessel and her cargo from distress. The owners appeared, claimed the vessel and cargo, and answered that the salvage claimed was exorbitant, and that the loan was unnecessary and illegal, and that no lien existed upon the vessel or cargo to secure its payment.

Henry B. Cleaves, Nathan Cleaves, and Joseph Howard, for libellant.

William L. Putnam, for claimants.

FOX, District Judge. Two libels are promoted against this ship and her cargo by Nathaniel L. Thompson, a merchant of Kennebunk in this district, one founded on an alleged bottomry bond, or hypothecatory obligation of the ship and cargo, executed to him by Young, the master of the ship, on the 19th day of January, 1871, as security for the payment of an advance of $10,000 in ninety days, made to the master by Thompson, and the other on salvage services rendered to the ship and cargo by Thompson and his assignor Cleaves, under a written contract for salvage made between Young and Cleaves December 15, 1870, and subsequently assigned to Thompson by Cleaves, after a partial performance of the salvage services.

The material facts are, that this vessel, an iron propeller of about 1,000 tons American registry, sailed from Newcastle upon Tyne in the fall of 1870, bound into the St. Lawrence. Her cargo consisted of about 100 tons of chemicals and glassware, together with the frame, plates and all other portions complete of an iron ferry boat, constructed for the Grand Trunk Railway by the Palmer Iron Shipbuilding Co., of Newcastle, who were also the owners of the "Clotilda." In the course of her voyage the ship fell into distress and went into Belfast, Ireland; she there took on board, according to the statement of her master, 100 tons of coal, which was thrown down among the iron to prevent any further shifting of the cargo, and the season being late, her destination was changed to Portland. H. & A. Allan were understood to be the consignees of the ship and cargo, but bills of lading were never received by them, as it is said, and they made no claim to the control or direction at any time afterwards.

On the morning of the 13th of December, the ship was stranded on Wells beach, about forty miles westerly from this port. The weather at the time was stormy, dark and foggy, and blowing a double reef top-sail breeze with a heavy sea. The beach is of sand, quite flat, affording very poor holding-ground, and is at the head of Wells bay, exposed to the full force of the winds and waves. The vessel went on at a low run of tides, near high water, and the sea broke heavily over her stern, she being fast in the breakers. The weather thus continued throughout nearly all of the 13th. The officers went ashore and took lodgings at the house of Mr. Davis, a respectable man living in that vicinity. At low tide the water left the forward part of the ship, so that on one side persons could pass freely to and from the ship. Her stern, rising and falling with the tide and sea, settled her in the sand making a bed for her. At low tide there were six or eight feet of water under the stern post. The master engaged Davis to procure men from the shore to go on board to clear up decks, get up cranes and other things necessary for discharging the cargo, and also to assist in pumping the ship; and eleven men were thus employed on board on the 14th.

A large crowd of people from the neighborhood collected on the beach near the ship on the 13th, including a number of experienced ship-masters, merchants and mechanics, and among them Robert Cleaves of Kennebunk, a place about ten miles from the ship. Cleaves has followed the sea for many years, has been in command of sailing vessels and steamships, and appears to have been a man of energy and readiness for emergencies, with funds at his command. He was introduced to the master of the "Clotilda," and offered his services if he could render any assistance. The master informed him that he had sent to Portland for Lloyds' agent, and to the Allans, and that he should probably act on their advice. Cleaves gave him references as to his ability and character and then left.

He returned the next morning to the beach; it was then clear, the weather had moderated and continued to moderate throughout

the 14th, but the ship was still in the breakers with the sea breaking over her. Cleaves inquired of the master "if he wanted any one to contract to save the cargo and ship," to which the master replied by asking what he would undertake to take the cargo out for. There is some discrepancy as to Cleaves' reply, as given by him in different portions of his testimony, whether his offer was one-third of the value, or one-third of the invoice cost, freight added; but on the whole, I find that Cleaves' offer was to discharge the cargo for one-third of its value. This offer the master declined as too high, and he took counsel of Capt. Aird, a master of one of the Allan Line of steamers, who advised him it was too large. Capt. Cleaves persisted in his original demand, setting forth, as best he could, the possible difficulties he might have to encounter, such as building rafts with the risk of their destruction by the wind and tides; and, also, that he might be obliged to rig purchases from the mast-head to the shore, and that he had other business of importance requiring his attention, so that he was not inclined to undertake the enterprise unless he should be fully paid for his services. After considerable discussion of the matter, Capt. Young, as Cleaves states, proposed "to pay for the discharge of the cargo on the beach above the spring tides, one-quarter part of the invoice price of the cargo, freight added, assigning as a reason for fixing the compensation in this manner, that the duties were very high on manufactured iron, and that they would be included in the value when landed, and would thereby very much increase the amount to be paid for its salvage if it should be computed on its value after being landed. On the 14th a survey was called, of which Capt. Aird was a member, and by their report made the same day, the surveyors recommended "that the ship be immediately discharged with a view of getting her afloat." Cleaves accepted the master's proposal, and the same evening a written contract was drawn up by Cleaves and signed by the parties at the Falmouth Hotel in this city, by which Cleaves agreed "to discharge from said ship all the cargo, stores. &c., that it was practicable and convenient to discharge, in as good order as the circumstances will permit, and to place as many men to work as he can work to advantage, and to use all the dispatch in his power to get the cargo out, and to place it above high water, ordinary spring tides on Wells beach, and that when the ship is afloat he will, if requested, put in sufficient sand for ballast;" for all which Young agreed "to give Cleaves the free use of blocks, tackle, engines, cranes, coal, &c., and to pay him twenty-five per cent. in gold on the invoice cost of said cargo in England, with freight added, on all that portion of said cargo that Cleaves takes out of said ship, and twenty-five per cent. on all the stores, tackle, apparel, &c., of the ship so deposited by Cleaves; salvage to be paid in Portland or Kennebunk as soon as the cargo is out, or as much of it as is practicable and convenient for him to take out. The value of said cargo is represented by said Young to be about $35,000 gold, and said Cleaves agrees to pay the eleven men who have worked on board for their day's work."

Under this agreement Cleaves immediately went to work discharging the cargo. With the exception of procuring a steam pump, he was at no other expense than the hiring of the men and teams he employed, working principally at low tide in discharging on to the sand alongside, occasionally at full tide, employing a few hands in breaking out the cargo and getting it within reach of the ship's tackles. He used the ship's engines, winches, cranes, &c., constantly, but states that he kept no account of his expenditures, and is not able to testify how long he was employed in this business, or the number of his men and teams, or the amount paid by him; his impression is that he expended $3,-000 in the operation.

From the testimony of Mr. Goodwin, we learn that he commenced work on the second day, and worked steadily all the time there was any thing done, and he was paid $2.00 per tide, receiving in the whole $32.00, the pay for one night's services as a watchman being included in that amount. The first week in January, the vessel being then filled with water, Cleaves concluded he had discharged all the cargo which was practicable without means of freeing her. At that time all the chemicals and glass, a portion of the sails, &c., and about three-fourths of the ferry boat had been landed. Young pressed upon Cleaves the importance of landing the balance, as it would add to the value of that already landed, and finally Cleaves agreed to procure a steam pump, if one could be had for a reasonable amount, to free the ship from water so that they could reach the balance of the cargo. Cleaves procured a pump at Portland for $325, which required some repairs, and before they were completed, and the balance of the cargo discharged, Cleaves assigned this contract to Thompson, who afterwards removed some of the sails, chains and anchors from the ship, and then surrendered her with the balance of the cargo on board to Hilton, who had been sent to Wells from New York by Barclay & Livingston, agents for the owners, and who claimed to act in their behalf. Barclay & Livingston had contracted with the Coast Wrecking Company to get the ship off for sixty per cent. salvage, and by the exertions of this company, after nearly four months' labor, the ship was finally taken off the beach, with the balance of her cargo in her, and brought to Portland in June last. $15,000 salvage was paid to the company in accordance with the contract, she being appraised with the cargo then in her at $25,-000.

At the time Thompson gave up the ship and cargo to Hilton, it was on condition that he should receive the salvage on the cargo on board, that which he would have been entitled to under the contract with Cleaves if he had landed it, as he was prepared with the steam-pump, at a small additional expense to have discharged it. The ship on examination in the dock was found badly damaged, her stern-post cracked, and her plating and rivets started and broken. Nothing was done by the master or Cleaves to hold the ship in position on the beach. As she was lightened by the discharge of the cargo, she consequently moved further up the beach, in all probably 500 to 600 feet, and also swung round, so that she was nearly broadside to the sea. She was thus carried beyond the force of the sea and breakers, and was in a much safer position than if she had remained where she struck; but if she could have been held there in safety, she would probably have come off in a few days, as the tides were on the increase, and the vessel was daily becoming more buoyant by the discharge of the cargo. The bottom was however all loose sand, and it is exceedingly doubtful whether with only her own ground tackle she could have been kept in position if the attempt had been made; and if the boisterous weather had continued and she remained in the breakers where she struck, she must soon have become a complete wreck.

Whilst Cleaves was at work discharging cargo, he called upon Young for money, and Young procured from the Allans $2,000 which he paid to Cleaves. In January, Cleaves demanded of Young payment of the balance due him under the salvage contract, and it not being paid, he left his demand for collection with his proctors. Young called upon various parties in order to raise the amount, and among others upon Thompson, the libellant, stating to him. "that the Allans had called upon him to repay them their advances, and that he was in want of $12,000 to pay Cleaves and Allans, and to forward the cargo to Portland and save the ship, and that he wanted the amount on a credit of four months." Thompson declined making the loan, and advised him to go to Portland and see the Allans to get his money. He returned, stating "that he had been offered the money in Portland at thirty per cent. and that the Allans advised him to get the money of Thompson in Kennebunk if he could; that Allans' folks had promised to let him have $4,000 or $5,000, but that they had received a dispatch not to let him have another dollar."

The owners had in the meantime been advised of the condition of the vessel, and ship and cargo were abandoned to the underwriters, and from that time neither owners, underwriters nor the Allans, in any way, so far as it appears. rendered any assistance to the master, gave him any advice or instructions, or took any steps to provide him with the necessary funds or credit. But all parties interested appear to have abandoned the master to his fate to do what he should think proper, or might by circumstances be compelled to do. manifestly not intending by anything they might do to be committed by the actions of the master in any ulterior proceedings, unless they should prove to be for their advantage. There was not that frankness and fair dealing which a master had a right to expect from his owners when advised that he was in distress in a foreign country; they seemed to fear that if they should give any advice or assistance to the master, they would thereby compromise their own rights among themselves, and they therefore preserved a complete silence, and abstained from all communication with him after the abandonment to the underwriters, and so cautious have they been, that it has not been thought advisable to inform the judgment of the court in relation to the transaction, by the testimony of the master or owners of either ship or cargo, or of the consignees or underwriters. The defence is apparently presented by the original owners in their answer, charging most fraudulent practices on the part of Young and Cleaves, whilst it appears in evidence that Capt. Young has by the same owners been since advanced to the command of another and more valuable ship belonging to them, thus most pointedly discrediting the good faith of their answer in charging him with such fraudulent practices. Whilst the defence is nominally made by the owners, the court cannot but believe that in fact it is conducted in behalf of the underwriters, the answer being subscribed and sworn to by New York merchants, one of whom is the general agent for Lloyds, and who has most diligently and carefully watched over and protected the interests of his principals, in no way compromising them by any voluntary explanations when examined as a witness, but the rather withholding all information which might in any way disclose any agency for the underwriters in making this defence.

This bottomry bond, as it is termed. was given under peculiar circumstances, and although drawn by able counsel, and intended to have the effect of an ordinary bond of bottomry, it is conceded that such cannot be its legal effect, as no maritime risk for any particular voyage is assumed by it. It recites, "that the ship is now ashore on Wells beach, and the master binds himself, the ship, tackle, apparel and cargo, a part of which lies on said beach, and the remainder on board the ship, in the sum of $10,400, to be paid to said Thompson, his heirs, &c.;" and the consideration is "that whereas said Christopher H. Young has been obliged to take up and has received from said Thompson, for the use of said ship and for the purpose of paying salvors for saving cargo and lightening said ship and other expenses accrued by the stranding of the ship, the sum of $10,-

000, the sum loaned, and the said sum of $400 additional for interest on sum loaned for ninety days as a premium, which sum loaned to be and remain as a lien and bottomry on said ship, her tackle, apparel, furniture and cargo, at the rate of sixteen per cent. per annum, for the purposes aforesaid, in consideration whereof, all the risks of the seas, rivers, enemies, fires, pirates, are to be on account of said Thompson; and for the better security of the sum and premium, the said master doth by these presents hypothecate and assign over to said Thompson, his heirs, &c., the said ship, her tackle, apparel and furniture and cargo aforesaid; * * * if the just and full sum of $10,000, being the sum borrowed, and also the premium of $400, shall be well and truly paid by said Young, at or before the expiration of ninety days, then this obligation and said hypothecation to be void and of no effect, otherwise to remain in full force and virtue. This instrument is made subject to all salvage that Capt. Robt. Cleaves of Kennebunk may have for balance of salvage due on said cargo and stores, and the said master reserves to himself the right of sale of said property, subject to the conditions of forfeiture of this bond and the claims of said Cleaves as aforesaid."

By this obligation the master was absolutely bound for the payment of the amount at the expiration of the ninety days, and although it recites that all the risks of the seas, rivers, &c., are to be on account of said Thompson, yet no particular voyage is set forth for which they are assumed, nor does it stipulate that the obligation is subject to any such condition, and that it shall become null and void in case of loss of the property by such casualties. This is not strictly a bottomry bond, and the second article in the libel founded upon it as such an instrument cannot be maintained. The libel contains a further article claiming to enforce a maritime lien on the ship and cargo for $10,000, the same being a loan for supplies and advances necessary for their care and preservation, and for which a lien existed, and which was by the master thus expended for their benefit. Such a lien, if it exists, may be enforced in this court, and is within the decisions in the cases of The Hunter [Case No. 6,904]; The William and Emmeline [Id. 17,687]; and The A. R. Dunlap [Id. 513]. It appears that Thompson well knew of the salvage contract made by Cleaves with Young, and of all that had been done in performance of it. He is therefore chargeable with full notice and affected with all the equities and obligations in relation to it, to the same extent that Cleaves would be if he were now prosecuting a libel founded on said contract.

It is therefore incumbent on the libellant to establish a necessity for the advances, and that the same were for the common benefit of ship and cargo, if he would sustain his libel against them. The justification for the advances by Thompson depends first, upon the validity and extent of Cleaves' lien upon the ship and cargo for the salvage services rendered by him, and secondly, upon the authority of the master to hypothecate by a loan the ship and cargo to discharge such lien. Upon the latter point it is sufficient to observe that the master at this time was wholly abandoned by the owners and all other parties to whom he had a right to look for assistance and advice. It was very evident that they were not willing to assume any obligation, or to make any advances to him in his distress, or even to advise him as to the course he should adopt; but they left him to be governed entirely by his own judgment under the circumstances in which he was placed.

His alleged consignees repudiated the consignment, and had, as he stated, called upon him to repay the amount they had advanced to him, and which he had paid to Cleaves on account of the salvage. The claim for the balance due to Cleaves under his contract had been left with the counsel for collection, and the only means of relief at the command of the master was from the property, either by permitting it to be libelled and disposed of by a court of admiralty, or from a loan by its hypothecation. The master then contemplated a completion of the voyage, that his ship would be relieved and the cargo forwarded to its place of destination, if he could obtain funds to pay the claims upon them and other expenses on a credit of three months, and in the opinion of the court, any prudent owner would have adopted the course taken by the master as he was then situated; and the master was not only justified, but it was his duty to have obtained the loan at a moderate rate of interest, and for a reasonable time to relieve the property from the liens then existing against it, and not have subjected it to the expense and delay attending proceedings in admiralty, devesting him of all control or possession of the property, and greatly hindering, if not utterly preventing, his getting the ship off the beach or forwarding the cargo.

Of the $10,000 which was paid by Thompson to Young, $6,000 was paid to Cleaves, $3,183 to H. & A. Allan, and the residue was applied by the master in payment of officers, wages and other expenses. So far as these sums were paid in discharge of Cleaves' claims, which were a lien upon the ship and cargo, including the repayment to the Allans of the $2,000 which was paid to Cleaves, to that extent the court is of opinion that the libel may be sustained, and the libellant be subrogated to his rights. What then was the extent of Cleaves' lien? Was this contract valid and obligatory, and were ship and cargo chargeable therewith?

The written contract stipulates for the discharge of the cargo, stores and apparel, as

far forth as practicable, at a compensation of twenty-five per cent. of the invoice value of the cargo, freight added, and a like proportion of the stores, tackle, &c. Nothing is said about the ship, or getting her off the beach; but it is quite evident that at that time the master expected the ship would be saved; and the discharge of the cargo was not only for the benefit of the cargo, but equally for the ship's advantage, as appears from the report of the surveyors, and the salvage services in unlading the cargo were for the common benefit of ship and cargo. If the ship had remained twenty-four hours longer in the breakers where she was when Cleaves commenced discharging, there can be but little question that her decks would have been stove by the sea, and she would have gone to pieces. By removing the cargo, she was enabled to pass beyond the reach of the breakers, and for the time being was removed to a place of safety. To effect this object, among others, the contract was made by Cleaves with the master. It proved successful, and all the property thereby benefited, both ship and cargo, was bound for the expenses thus incurred.

In defence, it is contended that this salvage agreement is invalid, being unconscionable in its amount, the sum claimed under it being greater than the actual value of the entire cargo. The rule in relation to such contracts as laid down in 2 Pars. Shipp. & Adm. 306, is that "if at the time of service, the salvors make a bargain with the owners of the property in peril or their servants as to the amount of salvage, this is enforced by the court only so far as it seems equitable and conformable to the merits of the case; and it is wholly disregarded if it be deemed unconscionable and oppressive to the owners of the property saved, or entered into under circumstances which amount to compulsion."

In Houseman v. The North Carolina, 15 Pet. [40 U. S.] 40, Taney, C. J., says, "In all such cases (of salvage contracts) unless the acts of the captain are ratified by the owners, his conduct will be carefully watched and scrutinized by the court, and his contracts will not be regarded as binding upon the parties concerned, unless they appear to have been bona fide and such as a discreet owner, placed in like circumstances, would have made. If he settles the amount by agreement, those who claim under it must show that the salvage awarded was reasonable and just." In The Emulous [Case No. 4,480], Judge Story says, "It is true that contracts made for salvage services are not ordinarily held obligatory by the court of admiralty upon the persons whose property is saved, unless the court can clearly see that no advantage is taken of the parties' situation and that the amount is just and reasonable."

This rule has repeatedly received the sanction of the high court of admiralty in England, and been recognized by this and other admiralty courts in this country. See The

W. D. B. [Id. 17,306]. If the agreement is proved, it should be presumed to be fair and equitable, and the burden is clearly upon the claimant to satisfy the court that to carry it into effect would be contrary to equity and justice, or that it was procured by fraud or compulsion.

The evidence does not establish that any fraud was practiced by Cleaves, or that the contract was obtained by compulsion, or any advantage taken of the position of the property of the master. On the contrary, the agreement was made with deliberation, between parties fully competent to contract, after time for reflection, and as the court has no doubt, after the master had consulted with Lloyds' agent as well as Capt. Aird and other parties in relation to it. At the same time the court is equally well assured that the agreement was entered into under a mutual mistake of the real condition of affairs and of the consequences which must result from its enforcement, and that to sustain it will produce gross injustice.

The invoice value of the cargo, freight added, is admitted to have been in currency, $47,178.20, twenty-five per cent. of which sum, $11,794.55, is the amount of salvage claimed for discharging the cargo; and to this is added a further sum of $660, being one-fourth of the alleged value of sails, stores, &c., belonging to the ship and landed from her under the salvage contract. An appraisal in bond of the entire cargo has been taken by order of the court, by persons well qualified for that duty, who have under oath estimated its entire value on the wharf in Portland at $14,086.49. Deducting from this amount the expense of removal from Wells beach to Portland, $3,-226.22 would leave the net value on the beach $10,860.27, whilst the amount claimed as salvage for its discharge is $11,794.55, being more than $900 beyond the value of the entire cargo. This appraisal, so far as it relates to the ferry-boat, is said to be erroneous and should not conclude the court, as the appraisers have considered it as of no greater value than scrap iron, and have not allowed its real value as the parts of a boat in readiness to be put together and completed. This was a matter entirely for the consideration of the appraisers, and courts of admiralty are never inclined to question the correctness of a valuation made by those it has selected for that duty. On the contrary, in England, such appraisal is always held conclusive as to value. I am not aware of any authority to that effect in this country, and without intending to decide whether the court is or not concluded by its valuation, I have no doubt that the appraisers in the present case have arrived at a just and correct result.

It must be recollected, that this portion of the cargo, the frame and plates of an iron ferry boat, is a kind of property designed

for a particular, special purpose, constructed at a great expense, and valuable for the purpose for which it was designed, but not susceptible of being used for any other purpose. Few customers can be found for such property; it is very seldom that such a boat is needed; it was constructed for a ferry boat in connection with railroad trains, quite long and flat, and unless accepted by the party for whom it was manufactured, in all probability a purchaser could not be obtained for it. Such, in the present instance, is shown to have been the case. By reason of the great delay attending its transportation, the Grand Trunk Railway considered itself exonerated from its obligation to accept it, and took no steps to obtain possession of it, even at the valuation objected to by the libellant; and the reasonable inference from the conduct of this company is, that it has from some other source obtained a boat, so that it has no occasion for this. This property has been extensively advertised in New York, Boston, and western papers, and the only offer received has been one of $40.00 per ton, from which, if the duties and expense of transhipment are deducted, it would afford a valuation not very different from that given by the appraisers. This portion of the cargo has been examined by a skilled mechanic, who states that many of the frames and ribs, constituting about one-third of the entire quantity of the whole cargo, were broken or badly twisted, and that some of the iron plates were also broken so that they were only fit for scrap iron, which of course very much reduces its value.

The libellant states that he was offered $45,000 for the cargo, and so informed Hilton, the agent for the underwriters, and that when a week or two afterwards Hilton wanted him to take it he refused as the chance had gone. At that time the property was in the custody of the court, and on petition the court would at once have directed the acceptance of the offer; it is not referred to in any of the correspondence, and the court cannot but think that there is some mistake in relation to it, and that for the cargo, as it then was, no such amount would have been paid for it by any one after a careful examination of its condition.

Taking therefore the valuation as correct, and sustaining and enforcing this salvage agreement, the entire cargo would not pay for its landing, and it would require the further sum of $900 to be realized from the ship and freight, if the cargo was first applied to the payment. It is claimed that the ship should bear her proportion of this expense, as she was benefited by the discharge of the cargo and removed thereby from immediate peril to temporary safety. As I have before stated, I think this expenditure was for the common benefit and to the advantage of the ship, and she should bear her proportion of it according to the benefit rendered to her from the expenditure. She was rescued from the then impending peril of destruction from the breakers, but she was not then brought into safety and a condition to perform her voyage.

To accomplish this, a long delay and heavy expenditures were incurred, which, in my view, should be deducted from the value of the ship before she can be called upon to contribute to the expense of her discharge. She was valued at $20,000 in the dock at Portland, but this did not include her sails, spars, chains, &c., amounting to about $2,000 additional. Her whole value, therefore, when taken off the beach was about $22,000, on which sixty per cent. was paid the Coast Wrecking Company as subsequent salvors. Deducting the amount of this second salvage would leave a value of $9,000 in the ship to contribute to the expense of her discharge, which added to the net value of the cargo on the beach, $10,860.27, gives an aggregate of property of nearly $20,000 to contribute to the salvage claim of $11,794.55 for cargo, and $660 on sails, chains, &c., amounting to $12,454.55 to be borne by the $20,000.

Cleaves was engaged but about a fortnight in this enterprise; the labor was not very severe or perilous, as after the second day he found no difficulty in obtaining all the men he required at $2.00 per tide, and ox-teams including drivers at $4.00 per tide; the weather was cold but not stormy, with the exception of one day, and his expenses beyond his payments for men and teams and the steam pump did not exceed $100. His contract gave him the privilege of the ship's coal, engines, tackles and cranes, and by means of them he was enabled to discharge successfully a large portion of the cargo at an expense, so far as the court can discover from his own statements, not exceeding $2,000 or $2,500.

The principal part of the cargo was heavy, crooked and difficult to handle, but the hindrances were not very different from what they would have been at many of the wharves in this town. It was allowed to be dropped upon the beach, and in some instances by so doing was broken or bent, and its value greatly diminished; but it was necessary to use all expedition possible in this work, and the court is not inclined to make any great deduction on this account, although with more care and time it would undoubtedly have been landed in better condition. The salvage claim is four-fold the expenditure, without any risk of property, or any personal exposure to danger, or requiring of the salvors extraordinary skill and exposure in the business, and is more than fifty per cent. of the entire value of all the property benefited by the service, which is the usual amount allowed in cases of derelict at sea, attended with much risk and exposure

of persons and property. I have stated that this agreement was entered into under mutual mistake, and it is very manifest that such was the case, as the parties would never have entered into an agreement to pay $900 more than the entire value of the cargo for merely discharging it on the beach above spring tides.

If both parties had then known that its value when landed would not have exceeded $11,000, it cannot be supposed they would have contracted that Cleaves should receive $11,794 for its discharge. Both believed that when landed it would be worth and would command nearly, if not quite, its full invoice value with freight. They do not appear to have contemplated any diminution of its value by reason of the damage it had sustained on the voyage, or which it might receive in process of landing, or from its not being a kind of property which at all times would command a purchaser at nearly its original cost. There was evidently such a mistake as would require a court of admiralty in the present instance not to hold this agreement obligatory upon the claimants.

In the opinion of the court a salvage contract similar to the one now under consideration ordinarily should not receive the sanction of the court, it being in conflict with the policy of courts of admiralty in matters of salvage. The value of the property as saved should always be a very important element in determining the amount, and an agreement to pay a fixed proportion of the invoice value and freight, entirely excludes any consideration of the present value of the property. Salvage services are only required when the ship or cargo is in distress; and when a vessel is stranded, it is almost certain to be the case that the cargo is more or less injured, and in most cases so as to materially affect its value and reduce it below its original invoice cost. Compensation for salvage services is allowed by reason of the benefit conferred, and ought to bear some proportion to such benefit. This can only be ascertained by an examination of the cargo, and if found damaged, the benefit being so much the less, the award for salvage should be affected thereby; but by the rule adopted in this agreement, the salvor is assured of his reward without any regard to the benefit he may render the owner. The cargo may from various causes, as in the present instance, not be of sufficient value to pay the price agreed, and yet if the agreement is to control the rights of the parties, the salvors will realize more than the whole value of the property.

It is for the interest of commerce and navigation that compensation for salvage services should usually be somewhat of a contingent nature, dependent on the value of the property rescued from peril by the services. The diligence and skill of salvors are thereby incited and promoted, and they will be much more likely to render valuable aid and assistance, and to rescue from peril a much larger amount of property, if they understand that their reward is dependent upon the value of the property saved, than they otherwise would, if they were sure of a certain amount, provided the property saved proves insufficient to realize such amount. Salvage services are generally required in storms and rough weather, are attended with more or less danger and exposure, and salvors would not be inclined to expose themselves to continued peril and danger in rescuing the balance of the property at risk, after they had saved enough to insure their own demand upon it, under a contract like the present. It is frequently the case, that the portion of the cargo which is in the lower hold of a ship in distress cannot be discharged without much more cost and peril than attends the discharge of that found between decks; and it is certainly not salutary or judicious for the court to approve of any practices by which salvors will be induced to abstain from saving that portion of a ship's cargo which is most difficult to rescue, and content themselves with taking care of that only which can be preserved without much trouble or exposure.

The agreement not being sustained by the court, it only remains to determine what is a reasonable award for the salvage services rendered, the property benefited thereby being of the estimated value of $20,000. The cargo is stated in the contract to have been of the invoice value of $35,000 in gold, so that the amount which Cleaves expected to receive was in excess of $10,000.

"Compensation as salvage is not viewed by the admiralty courts merely as pay on the principle of quantum meruit, or as a remuneration pro opere et labore, but as a reward given for perilous services voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property. Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him in case he is successful a liberal compensation." The Blackwell, 10 Wall. [77 U. S.] 14.

In my view, the sum of $6,000 under all the circumstances of this case is a reasonable and just award for the salvage services. It is probably a somewhat larger sum than the court would have awarded if there had been no agreement in relation to the amount; but an inducement of a much larger compensation was thus held out by the master to Cleaves if he would undertake the service, and it is possible he might not have assumed it if he had not expected to be thus liberally rewarded. If these claimants, therefore, are required to pay more than they otherwise

might have been, they must ascribe it to the conduct of their master, for whose proceedings they are to some degree thus held responsible. Decree for $6,000 and costs on the first libel. Second libel dismissed without costs.